The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court.  We are so happy to be back here and to be with all of you and we look forward to your arguments. We'll start out with our first case, number 20, 1648. Baturin v. Commissioner of Internal Revenue. Mr. Dale. Good morning and may it please the Court. My name is Ivan Dale on behalf of the Commissioner of Internal Revenue. I preserve seven minutes for rebuttal. Certain facts in this case are undisputed. In 2006, Dr. Vitaly Baturin received an offer of employment and accepted that offer from Jefferson Lab in Newport News, Virginia. He began work soon thereafter as a staff scientist 1 in the lab's physics division and kept that role throughout his tenure. His job involved developing one of the detectors in connection with the upgrade of Jefferson Lab's particle accelerator. He reported to an immediate supervisor who advised him of his duties. He attended employee orientation and his employment was governed by the company manual. Dr. Baturin received the same benefits as other employees and like those other employees, his continued employment was contingent upon satisfactory performance of his duties. He was given a starting salary of $75,000 per year, which by 2012 had grown to about $82,600 per year. He received a paycheck that was paid via direct deposit. Jefferson Lab reported Dr. Baturin's income as W-2 wages, making withholdings, and paying contributions to Medicare and Social Security. Unlike his American counterparts at Jefferson Lab, Dr. Baturin claimed, and the tax court agreed, that as a Russian national, his paychecks were exempt from U.S. taxation under Article 18 for a tax convention with Russia. That article provides a tax exemption for those who are temporarily present in the other country to study or do research as the recipient of a grant, allowance, or other similar payment. Dr. Baturin claims that as an employee of Jefferson Lab, that he is a recipient of a grant, allowance, or similar payment. But compensation for services provided by an employee, which is what Dr. Baturin received... Mr. Dale, you say services, but what was he in fact doing? Research as contemplated by the treaty? Yeah, we concede that he was conducting research within the meaning of the treaty. I mean, developing the detector as part of this upgrade involves some cutting-edge stuff. It's more than just assembling parts that you get from a supplier. So it is sort of cutting-edge stuff as I understand it. But it wasn't his research. Even he concedes on page 14 of this brief. Why does that matter? Because the research is JSA's research. He is performing a service for JSA in assisting in that research project. Does the treaty make that distinction? The treaty makes a distinction between wages, salaries, in respect of employment on the one hand, and grants, allowance, and similar payments on the other hand. So he is the recipient of salaries in respect of employment, conducting research, rather than the recipient of a grant, allowance, or similar payment. What would a grant have had to look like? What kind of scheme do you think this treaty contemplated? In 1980, the IRS put out a revenue ruling that sort of explained the difference between these sort of compensation for services and grants. It dealt with two cardiologists who were temporarily present in the United States under the Japan Treaty, which provided an exemption for grants, allowance, or awards. Under that ruling, the IRS said that one of the cardiologists who carried out research according to a plan submitted with a grant application, was not directly supervised by an employee of the foundation, had the right to the product of his research, and was entitled, but not required, to publish the results of his research. That cardiologist was a recipient of a tax-exempt grant. The other cardiologist was paid an amount to do research on a project chosen by the foundation, was supervised by the foundation in what was essentially an employment relationship, and had no rights to the results of his research. That cardiologist was receiving compensation for services, and his pay was not tax-exempt. Dr. Vitorin's paycheck is like the second cardiologist, and not like the first cardiologist. He was paid to work on a Jefferson Lab project, he reported to a supervisor who told him his duties, he wasn't entitled to the results of his research. So if we follow that revenue ruling, there is no doubt that Vitorin did not receive a grant. That revenue ruling was the first of four revenue rulings that immediately preceded the negotiation of the Russia Convention, and those four revenue rulings laid out, with respect to 17 different treaties, how to distinguish between compensation for services, which is taxable, and grants, allowance, and awards, which are not taxable. That is the context in which the Russia Convention was negotiated. The very agency that was charged with implementing and enforcing these other treaties, and was charged with negotiating, implementing, and enforcing the Russia Convention, so ruled. Sorry to interrupt you, but with respect to your definition of a grant, could any portion of that grant, under your view of things, be used for personal sustenance and expenses and the like? I assume that's part of what the money for the salary went to, but under your view of things, the grant money must be used exclusively for the research conducted, it can't be used for personal expenses? No, that's not our position at all. I mean, an allowance, for instance, a per diem allowance. Well, why isn't that this case then? Well, because, so if you pay somebody in a grant or an allowance, it enables them to do research. You're not providing a service to the grantor. You are conducting your own research with the aid of a benefactor in the form of the grantor. The key here is the sort of quid pro quo employment relationship. You do this work and you get paid. You don't do this work, you don't get paid. So, I guess the question is whether or not this research was undertaken for the public interest or for private benefit, and your view is that it was primarily for the employer, not for the benefit of the public? Well, so, we conceded that point principally because Jefferson Lab is a Department of Energy facility. So, it's not, you know, it's not, although JSA is a private company, you know, there are obviously public benefits that come out of having, you know, an electron beam particle accelerator that studies the basic building blocks of matter. In terms of, you know, how that particle accelerator is conducted and what is necessary, a lot of that was kept under wraps. Dr. Vitorin had to take a lot of security exams. He was given access to a lot of confidential information. So, the results of whatever work was being done was not necessarily made public, but we conceded in the tax court that the public benefit element of that because it was a Department of Energy. Mr. Dale, I have a question. The tax court was very, very broad in its holding. At the bottom of page 19 of its opinion, it says, we conclude that the petitioner is the recipient of a grant, allowance, or similar payment. What is a similar payment from the government's position? Well, you know, some things that are called grants, that are grants may not necessarily be called grants. They may be called stipends or fellowships or scholarships or, you know, the term grant, you know, is not necessary. But what is necessary is the sort of relatively disinterested, no strings attached, no quid pro quo grant. Well, grants and allowances aren't, are they similar in your position? Well, no. I mean, the grant doesn't, isn't for specific expenditures where an allowance is generally estimates specific expenditures. Right. And so what would be a similar payment then if grants and allowances are not similar? In other words, how do we figure this out at the tax court's holding? It's very, very broad, isn't it, by saying that it's a similar payment or may have been a similar payment. He was the recipient of a grant, allowance or similar payment. That's a pretty large basket. So tell us, tell us what the parameters of that basket are. Well, again, that's what, that's what we've, that's what those revenue rulings were talking about. You know, is the payment, is the recipient of the payment expected to devote their time exclusively to research training? Or were they expected to perform services for the payor? Do they participate in Social Security and other benefits? Those sort of things are, you know, Social Security is not a grant in that context. But also know that under the treaty, wages, salaries and other similar remuneration are taxable. So that language is fairly broad, too. Do you rely on Bingler? Do I rely on? Bingler, the case, B-I-N-G-L-E-R? So Bingler upheld the Treasury regulation. Right. The term fellowship grant. Right, but I hadn't heard you talk about it at all here. Yeah, well, I used the language relatively disinterested, no strings, educational grants with no requirement of any quid pro quo on behalf of the recipient. And so while that term refers to fellowship grants, which I think are more in the educational context, if you take out, you know, the word educational in that discussion, then I think Bingler is directly on point. And it's persuasive at the least in that it says this is the ordinary understanding of the term grant. You know, recipients of grants don't really think they work for the grantor. They think they are the recipient of something and then are able to do work because of the generosity of that benefit. Is there any indication that the whole Bingler analysis was incorporated into the treaty? I mean, is there anything in this record that tells us that? Or do you know anything? Well, so the Bingler analysis was incorporated into the Treasury regulation. Right. It was incorporated in the revenue rulings. So it's United States law. So it's United States law to that extent. We are the country, and so the treaty talks about the country where the work is being done. Is that where you're going? And we are the country? Right. We are the host country. Right. But, yeah, so the revenue rulings and the Treasury regulations preceded negotiation of the Russia Convention, and they are extremely strong evidence of the intent of the Treasury Department when they negotiated the Russia Convention. So has anyone asked the State Department their views on this? We consulted with the State Department as part of our briefing on the case, and they concurred with our analysis. Do you tell us that anywhere in the brief? I don't. You just told us that, right? Yeah. You asked. Yeah, we try to make sure we covered our basis on that. But, yeah, and the thing is, it's kind of hornbook treaty interpretation law that the interpretation assigned to treaty provisions by the executive branch agency charged with enforcing and implementing and negotiating the treaty is given great weight. We cited a couple of Supreme Court cases to that effect in our reply brief. It's even in the restatements for foreign relations, Section 306, I believe. So the IRS's interpretation is given a lot of deference. I think I'm out of time. You are out of time. Thank you very much for your argument. I think you have some rebuttal. Mr. Rober? Thank you. Good morning. I may have pleased the court. Aaron Roper is court-appointed amicus in support of affirmance. For three reasons, this court should hold that Dr. Patern is entitled to the treaty's Article 18 tax exemption for research grants. First, the term grant is a settled meaning in the research context, specific funds for specific research. The treaty's references to research and scientific organizations incorporate that meaning. I'm sorry, where do you get that meaning? That meaning comes from the generally accepted understanding of research in this area. It's the ordinary meaning. We cited a host of federal guidelines, grant-making rules that show how researchers understand the term. For example, we have the National Science Foundation. And has the Supreme Court told us that those are appropriate things to look at? As evidence of ordinary meaning, I think you can look at any use of the word contemporary with the interpretation. I thought we looked at what the law of the state was, being the United States in this instance. And I didn't get that any of those were in some definition in the law of the United States. But help me here. Of course. So first, the treaty directs you to read the term in context, which is the first order interpretive principle in Article 3 of the treaty. And then second, it directs you to the laws of the United States. We agree. But the laws of the United States, as the IRS concedes, do not define the term grant generally. And they do not define the term research grant. Instead, the only thing the IRS is able to point to here are these regulatory interpretations of the term fellowship grant. Yeah, but that is the only thing that we have. I mean, that's closer than nothing. I think the context is the closest, Your Honor. I mean, we have this well-accepted meaning that the IRS hasn't taken issue with. I think ordinary meaning is the first order principle here. But I don't have any reason to quibble with the fellowship grant regulations account of how academic fellowship grants work. Can you talk just a tad louder? Maybe it's just me, or maybe the microphone is. Of course. I can speak up. Yeah, so we don't have any reason to quibble with fellowship grants. But the operation of grants in the research context is just simply different. So if you adopted the meaning from fellowship grants, you'd be knocking out a huge swath of totally ordinary everyday research grants, as researchers understand that term, totally gutting the specially negotiated provision that was intended to provide benefits to researchers. And, Mr. Roper, is it your position that a person can be an employee for one purpose and a grantee for another? It is. Okay. Could you tell us, then, what are the boundaries for this duality? I mean, because here we have the W-2s. We have the employee benefits. We have pretty strong evidence of an employment relationship. So where does the balance come from? What are the outer limits? Help us with that. Yeah, so we don't view it as a duality. We think the fundamental question is, was there a grant? And the fact that there's evidence of employment is totally consistent with that. I mean, it is an extremely common practice in everyday research to pay out grants to researchers in the form of salaries. Right, but we know he was treated as an employee in certain very well-documented aspects, the eligibility for the employment benefits, the W-2. So how do you then reconcile that with your position of the grant? I haven't heard that really yet. So we don't think those are bad facts for us at all. The central question is, was there a grant in the first instance? And then, if that was dispersed as an employee compensation, that's totally normal. Okay, where is the evidence of a grant? I've been troubled by that, too. You know, I wonder if it didn't – there wasn't a lack of evidence in front of the trial court because – perhaps because the plaintiff was pro se. You know, it's unclear exactly what happened. But where is the evidence of the grant in this record? So I'll readily agree that it's not the clearest record. I think the strongest place we can point to is Dr. Baturin's testimony, most clearly at pages 266 to 270 of the appendix. He testifies repeatedly that Jefferson Lab filled a box or bank account of money for his benefit for his specific work on subatomic particle detectors. And the tax court did not clearly err in understanding that as factual testimony about what he was told was happening to him. The IRS obviously – But how would that be inconsistent with paying a salary? We don't view it as inconsistent. Our position is that it is fully consistent to have a grant that is then dispersed to the individual as employee compensation. Well, I understand, but my colleague has been asking you – we understand the part that looks like compensation. But we don't understand the part that looks like grant. And you're saying to me they're not inconsistent because you can distribute a grant in this way. True enough. But where is the evidence that it is just – that it is grant? So I think the grant is the filling the box of money. They set aside – taking $75,000 and putting it aside and saying, Dr. Baturin, this is $75,000 we are earmarking for your support for this specific work you are going to be doing on this specific subatomic particle detector. How does the escalation in salary then play into your analysis or escalation in remuneration? So the tax court found that the remuneration did not increase, and that finding was not clearly erroneous. So there's conflicting evidence on this point. If you look at every iteration of Dr. Baturin's immigration paperwork, it says he was getting $75,000. Yes, the W-2s have a different amount. It's unclear what that extra money is, if it was a family allowance or conference attendee or what have you. Obviously, the IRS could have asked Dr. Baturin about that difference at trial. This was all in the record. The IRS chose to ask only nine questions on cross-examination and offer no evidence. So on that record, I don't think the tax court's finding is clearly erroneous. Even though if you thought the grant amount was going up year-to-year, I don't think that would be a problem for Dr. Baturin. Grants do sometimes bake in cost-of-living adjustments. For example, if you look at the NIH appropriation statute, that pegs grants paid out of salaries in the NIH grants to the federal pay scale, which obviously goes up year-to-year. So that wouldn't be a problem for Dr. Baturin. But ultimately here, Dr. Baturin put forward credible testimony, credible evidence in the form of his testimony. I agree it's ambiguous. But once he'd done that, the burden of proof shifted to the IRS under Section 7491A1 of the tax code. So to the extent you think this record is ambiguous or there are gaps here, those are really failures of the IRS's burden of proof. All Dr. Baturin had to do was, as a pro se party, put forward this credible evidence, which he did. And then the IRS needed to rebut him. And it simply fell down on its burden in this case. Can I ask you, the doctor is now here on an H-1B visa. Is that correct? He was at the time of the most recent documents in the record. I don't know his current status. As of 2012? Yes. Right. And under that visa, he is an employee, correct? He is a worker, yes. I beg your pardon? I think worker is what the document says, yes. Well, for our purposes, he was being employed rather than receiving a grant. We don't know what he was receiving in those years. There's not document evidence about what the initial set-aside was. But there's no evidence. Did he pay a tax on it? We don't know from the record. The IRS didn't ask a question about that. So let us assume for the moment here that if you're on an H-1B visa and you receive money, it is taxable income. Just bear with me here. Okay, what things was he doing in 2012 that he hadn't been doing in 2011? So we don't have any record evidence about his specific duties. Again, the IRS didn't ask for that, didn't build a record for it. But I think the key is not the duties. The key is what was the initial structure of the compensation. What did the grantor say up front? Did they say, you're just going to be getting money biweekly as long as you work? Or did they say? Well, we don't have any evidence of that either, do we? We have his testimony that there was a specific set-aside. A specific what? Set-aside. They said, we are filling a box of $75,000 for you. That is the grant. Is your position that that lasts indefinitely? That's for 20 years? No, it was an initial two-year term. So it would have been a two-year grant of $75,000 a year. And then they renewed the grant, which is common in the grant-making field. You can get an extension of your grant with additional funds. From Dr. Baturin's testimony, that is what happened here. And that is how the tax court understood it. And again, this is a – It sounds like there are lots of things that aren't in the record. Maybe are necessary for a remand for us to really understand what's going on. So respectfully, I don't think a remand would be appropriate because it was the IRS's obligation once Dr. Baturin had put forward some credible evidence for them to rebut him. So I don't think the IRS should be getting a second bite at the apple on its evidentiary failures at trial. Well, if we determine that the Bangler framework applies, and there's nothing in the record of what Jefferson Labs gets out hiring Dr. Baturin, should we then remand for 5,000? Possibly, but I would just really push back on the idea that Bangler is relevant here. Oh, you don't think Bangler's relevant? Correct. Okay. Our position is that Bangler is talking about scholarships and fellowships. I don't think there's anything incorrect about his characterization of how those work. But this is a case about research grants, and the practice is just different. And I think that difference is relevant to determining whether the grant was actually being used for the purpose. So suppose, for example, that you had a Russian student come in claiming to be the recipient of a scholarship grant, but its only evidence was a W-2 and biweekly payments. I think the IRS would rightly look really askance at that because scholarships aren't typically dispersed biweekly, and you don't get a W-2. You get a lump sum at the end of the semester, and you get a different tax form at the end of the year. So in that case, the evidence of employment would be a problem. But in the research setting, it is extremely common to have this employment structure. And how do we know that? You keep telling me things that aren't in the record. So you had an expert testify that that was particularly common? No, we're looking to ordinary meeting here from the government's own documents about how it structures its own grant programs. The National Science Foundation and the NIH are some of the largest grant-making entities in America. They fund billions of dollars of basic science research, like Dr. Paterno was doing, to the government's own documents. They haven't disagreed that that is how the practice ordinarily works in this setting. And I think they're a really strong indication of ordinary meeting in this area. I'm sorry, what haven't they disagreed? Of course, Judge Watts. They haven't disagreed with our account of how grants work for researchers. They haven't disagreed that it is extremely common for a researcher to have an employment relationship with the grantor or the conduit institution and then to get their actual money in the form of a direct deposit with a W-2. These are all extremely common, ordinary practices for researchers. Is it your contention that all researchers get grants? No, it's not. And this case turns on the tax court's specific fact-finding that there was this advanced set-aside here for Dr. Paterno to work on this specific research project. That's crucial, and that's the only reason that he won in the tax court. Does it matter that the tax court apparently also found that the continued payment of any grant money was subject to the availability of funds? No, it does not. I believe that finding is supported by the record. The tax court's reading of the letters there is reasonable, but it is also not uncommon for grants to be contingent on funding. I mean, if you are the recipient of a multi-year NIH grant and Congress just doesn't appropriate money in the second year, you don't become a judgment creditor of the United States. Your grant says up front, this grant is subject to federal appropriations, and if Congress doesn't appropriate the money, you're out of luck. What about the separate finding that the payment of a grant was subject to satisfactory performance? That as well. Grants set out a detailed list of conditions that grantees have to comply with, and grantors always reserve the right to rescind the grant if the grant terms aren't being complied with. And how do we know that? From the same sources, Your Honor. What same sources? From the federal grant guidelines for Science Foundation grants, NIH grants. You can look through, you see hundreds of pages of criteria that federal grant recipients have to comply with. And all that's part of the records? Really, the point I'm getting at is to almost everything that we've asked you that might be an unfavorable fact for your position, you say, well, it's not in the record. And it seems to me that you rely on a lot of stuff. You rely on a lot of stuff also that's not in the record. I think the difference, though, is that we're answering different types of questions. The things the IRS doesn't have in the record are factual questions about what happened in this case. What we're pointing to is just evidence of how people understand the word in ordinary English, just like you'd look to a dictionary that's not in the record or a case that's not in the record. We're not saying that these grant guidelines are somehow incorporated into Dr. Baturin's situation. We're looking to them as evidence of how an ordinary speaker of English in the setting would understand the term at the time the treaty was ratified. I hear what you're saying, but I don't know that that gets us any closer to what the law is than what you're objecting to from the IRS. Well, then let me point you to Article 3.2 of the treaty, which says that undefined terms, as a first-order principle, have to be read in context. And here the context is that it's talking about research grants. The closest thing we have to anybody interpreting research grants is the Bingler case. I respectfully disagree. The Bingler case is interpreting the term scholarship or fellowship grant. Educational grants, no strings educational grants. There's no requirement of any substantial quid pro quo from the recipient. And the statute it's interpreting there is a statute that exempts scholarships or fellowship grants. So we're in this fellowship setting, and our position is that that is just simply a different context. In the academic fellowship setting, you do not have the same common practice of paying out grants in the form of employee compensation. So the Supreme Court was interpreting the term in context, just like we're doing here. I mean, your whole position is that Bingler is bad law, that it's outdated. Two courts of appeals have recently relied on it. No, our position is that Bingler is just defining a different term. Those two court of appeals cases that the IRS is talking about were about interpreting the term scholarship or fellowship grant, the actual statute that the regulations and that Bingler are interpreting. This case is about a different term in an entirely different body of law. And in this setting, it is extremely common to pay out grants in the form of salaries. When was the United States-Russia Treaty signed? It was signed in 1992. Mr. Roper, I think this gets back to a question that Judge Keenan asked earlier, is that it seems like every indicia that would suggest this was an employment relationship, you say that it's not necessarily inconsistent with that of a grant relationship. So what would have had to have been different in this case for your position not to prevail? I think if Dr. Patern had not testified that there was a box of money or a bank account billed for his benefit, he would have lost, because then the only evidence in the record would have been an ordinary salaried employment relationship, which, standing alone, is not a grant. Our point is simply that grants and employment are not inconsistent, and so we have to look at the record and see if there is evidence here of a grant. And how do you take a box or a, I mean, what does that mean? I take Dr. Patern, and the Tax Court, with clear error deference, took Dr. Patern to be saying that Jefferson Lab had set aside this money. It was earmarked in advance. We are putting $75,000 aside. This is going to be what's going to pay you for this year. This is special guaranteed funding for you. It's not just an ordinary line item in my employer's budget that they're going to pay me X amount of dollars if I work there for the whole year. This is really a more designated set aside, which is the ordinary understanding of grants. What if an employer put aside in a box, a literal box, the money to pay the payroll? If they described it as guaranteed up front, yes, if there was also the specific project, I think that would be a grant. I also just want to underscore really briefly the dramatic consequences of the IRS's view, given how extremely common this relationship is. If you adopt their theory, you're knocking out a huge category of totally ordinary research grants from the Treaties of Protection, which I think you should be very hesitant to do, given the special benefits here. Thank you very much. I think that you have another person who wants to. Yes, let me change the mic. Thank you. Thank you, Your Honor. I would like to draw your attention to IRS instructions for JVs, the taxpayers. Those are documents 38 and 39. These instructions reference tax treaty about 130 times and J visa 16 times. Details may be found in my brief, document 40, pages 24, 28. Basic instructions for exchange visitor are given in document 38, page 11, section income connected with trade or business. From this section, we read that J1 visa holder must include his salaries on line 22 of the form 1040NR, tax return form for non-resident aliens, page A308 of the appendix. Note that line 22 is labeled as tax income exempt by a treaty. Then he must attach his W-2 form with salaries, indicate tax treaty, foreign country, and relevant article. He also must attach his exchange visitor certificate, DS-2019 form, page A314. This form specifies the funds reserved for him for the whole program up to five years. The last is required by document 39, page 26, section identification number for J1 visa holders, and similar in document 38, page 8. All that obviously means that, in fact, IRS recognizes the exchange visitor funds, including salary, as a subject to the tax treaty for five years. That's why IRS made a positive decision in 2010. And also I would like to mention that ordinary employment is forbidden within the program, within the exchange visitor program. It's A90, page A90 of the appendix. Doctor, thank you very much. We appreciate your argument. And I just want to tell you, you had a fine amicus representing you, as good a lawyer as I've ever seen. So you should feel very confident that your position has been put fairly before us. Thank you. Thank you. Thank you, Your Honor. I guess I can respond just sort of briefly to the contention that the IRS forms and regulations and J1 visa status automatically entitled the recipient   to an exemption. J1 visas cover a wide variety of exchange visitors. Some are scholars that are entitled to a tax exemption under various treaties. Some are subject to ordinary employment. The most common, I think, are you might be familiar with are au pairs and summer camp counselors, temporary summer workers. Those persons here on J1 visa are subject to taxation under every treaty as far as I'm aware. As far as the testimony about the box of money, we have, I think Dr. Petourin's brief sets it out. He's basing that on his reading of the regulations involved. And he testified, you know, the court asked him, so the money is secured and then Jefferson selects the person to be part of the program and he responded right. Yet, it's according to these procedures described in this 22 CFR 62. What happens in reality, I'm not sure. But if they follow these procedures, then, and then the court cuts him off and says, 22 CFR outlines those procedures and the witness says yes. So there's not an actual box of money at Jefferson Lab. That's, you know, got Dr. Petourin's name on it. Does that make any difference to his argument? It doesn't that much in terms of, I mean, look. Remember Al Gore and the locked box? So, I mean, look, let's say, you know, JSA budgeted money ahead of time for its exchange visitors, which I think it does have to under State Department regulations ensure that it's going to have funds. You know, if Dr. Petourin comes here and works, it's going to have the funds to pay him for his employment. And the State Department does oversee that program. It relies on, you know, private sponsors to do that work. But, you know, you do have to be solvent. And there are conditions to participate in the program. But at the same time, there's another State Department regulation, I think it's 6212, that says the exchange visitor has to have enough funds to arrive and support himself. So, you know, they're ensuring that people don't show up in the United States and then, you know, under shady pretexts. But even if the money is earmarked in advance, you know, let's say, for instance, Eli Lilly hires a foreign researcher to come over and conduct clinical trials on a new drug it's developing. And Eli Lilly gets, you know, the benefits of that research. But if it budgets that money ahead of time, I think under amicus's interpretation, like that would be a tax-exempt research grant. I mean, it's hard for me to see the distinction between just hiring a private researcher and giving a grant. I mean, in this case, there's no grant application. There's no grant funds given. Nobody called it anything a grant. There's no award to JSA. I mean, even if it is the case that, you know, sometimes a researcher might affiliate with a university and make an application and then the grant would be awarded to the university first and then paid to the researcher. And I think that's the conduit line of cases that the tax court was talking about in the opinion. You know, this is not that case. There's no award to JSA that then JSA gave out in the form of a salary. There's no grant evidence at all. So, I hadn't actually realized this until oral argument. That's why oral argument is actually valuable. But it seems to be the gist of the case on the other side is that you have the testimony of the doctor and you don't have any pushback about that from the government. About what he says goes on here. And so, there's a failure of the government to come up with its position and therefore we've got to affirm. Yeah, that's the gist of his argument. But there is, I mean, every documentary evidence in the case is to the contrary. I mean, if you look at exhibit 11J, you know, it confirms, first of all, I think counsel said that there was no evidence that there was any as to what happened when he switched to an H-1B visa. But here's a letter from JSA that says, you know, he was employed as a staff scientist on a J-1 research scholar visa and receiving full salary and benefits as all other employees. And then afterwards, he's on an H-1B temporary visa.  Well, it's 11J sets forth what, you know, the IRS attorney asked JSA what was going on here and the JSA furnished all this documentary evidence. And was that in front of the tax court? Yes, yes. And so that was, you know, that's chosen. At the time of trial, it was going to be a small tax non-presidential case and so I think the IRS was sufficient to rest on this documentary evidence. I mean, what are you going to argue against it? There's testimony, but the testimony is clear that the testimony is based on Dr. Bertorin's reading of the regulations and not actually talking about what he was told by JSA or anything like that. Mr. Dale, your colleague on the other side ended his argument with sort of the doomsday scenario that if we rule against Dr. Bertorin, this case is going to spell the end of grants and research-directed work as we know it. What is your response to that? Yeah, I mean, this case is not a close case. I mean, this is a clear employment scenario. But, you know, the regulations themselves say his concern is that, you know, what happens sometimes you have to furnish reports to the grantor and tell them, you know, what's going on here. Well, the regulations themselves say that neither the fact that the recipient is required to furnish reports of his progress to the grantor nor the fact that the results of his studies may be of some incidental benefit to the grantor shall by itself mean that the payment is not a grant. So it even allows for this sort of scenario that we're talking about where, you know, you're providing reports to NIH and so forth. But, you know, there's a long history in, is it half a century of case law? There's a long history in the revenue rulings. There's 17 other treaties that are interpreted just the way we're saying that this treaty should be interpreted. That is extremely important context in interpreting Russia. I'm sorry, before you sit down, maybe I may have asked you this earlier and I've already forgotten the answer. So what would JSF, JSA in this case, what would they have had to do in order to qualify Dr. Varturin as a proper research grantee? Right, so I think evidence, I mean, and you may not need all of these, but evidence of a plan that's submitted with a grant application and doing research according to that grant plan. It's not directly supervising Dr. Varturin, but Dr. Varturin provides reports of his progress. The product of the research is Dr. Varturin's and not Jefferson Labs. Dr. Varturin would be entitled but not required to publish the results of his research. If he was expected to devote his time exclusively to training and not perform services directly for JSA, not participating in Social Security, not eligible for ordinary employee benefits, no increase in stipends based on merit, then that sort of evidence would be indications of a grant-type relationship, and those are all spelled out in the revenue rulings in the Treasury Regulations. Are grants labeled grants? Are grants labeled grants? Most of the time, although they might be labeled a fellowship. I know it's not necessary, but it's not unusual to have a grant labeled a grant. No, I think if you're a recipient of a grant, usually you've applied for a grant. All right. If there are no other questions, we ask that the Court reverse the decision of the Tax Court with instructions to include Mr. Varturin's pay into his proceedings. Thank you very much.
judges: Diana Gribbon Motz, Albert Diaz, Barbara Milano Keenan